# United States Court of Appeals for the Federal Circuit

---

**VIRGIN ISLANDS PORT AUTHORITY,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2018-1698

---

Appeal from the United States Court of Federal Claims in No. 1:13-cv-00390-EGB, Senior Judge Eric G. Bruggink.

---

Decided: April 26, 2019

---

GEOFFREY P. EATON, Winston & Strawn LLP, Washington, DC, argued for plaintiff-appellant.

ELIZABETH ANNE SPECK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by JOSEPH H. HUNT, CLAUDIA BURKE, ROBERT EDWARD KIRSCHMAN, JR.

---

Before DYK, MAYER, and CLEVENGER, *Circuit Judges.*

DYK, *Circuit Judge.*

The Virgin Islands Port Authority ("VIPA") appeals from the grant of the United States' motion for summary judgment in the U.S. Court of Federal Claims ("Claims Court"). The Claims Court rejected VIPA's claim that the collection of wharfage and tonnage fees by the U.S. Customs and Border Protection ("Customs") constituted an illegal exaction. We affirm.

BACKGROUND

The dispute between VIPA and the United States centers on the question of whether certain fees were lawfully collected by Customs from users of ports in the U.S. Virgin Islands ("Virgin Islands"). The particular fees at issue are wharfage fees, "the charge assessed for the service or use of the wharf," and tonnage fees, "the fee charged a vessel for entering and using a port of the U.S. Virgin Islands." J.A. 11 & n.1. While Customs is required under statute to collect customs duties, *see* 48 U.S.C. §§ 1406h, 1406i, and 1642a, the government abandoned reliance on those statutes below as authorizing collection of the disputed fees.

The parties agree that the statutory source, if any, of Customs' authorization to collect the disputed fees is 48 U.S.C. § 1469c, which provides in pertinent part:

To the extent practicable, services, facilities, and equipment of agencies and instrumentalities of the United States Government may be made available, on a reimbursable basis, to the governments of the territories and possessions of the United States . . . .

The Claims Court has detailed the history between Customs and the Virgin Islands, so we focus only on the particularly salient portions. The Virgin Islands is a territory of the United States that can set and receive proceeds from duties, and VIPA is "a public corporation and autonomous governmental instrumentality" of the Virgin Islands' government. V.I. Code Ann. tit. 29, § 541(a). VIPA is

authorized to, *inter alia*, "determine, fix, alter, charge, and collect reasonable rates, fees, rentals, ship's dues and other charges." *Id.* § 543(12). Since its creation in 1968, VIPA has set wharfage and tonnage fees in its Marine Tariff Schedule.

Customs collected the wharfage and tonnage fees from 1969 to 2011, deducted the costs it incurred from providing its services, and remitted any remaining funds to the Virgin Islands Deposit Fund, which the Virgin Islands controls. The funds were then transferred to VIPA. The source of authority for Customs' collection of the fees before 1994 is unclear.

In 1994, the Virgin Islands and Customs entered into a memorandum of agreement ("1994 MOA"), whereby the parties agreed to "the methodology for determining the costs chargeable to [the Virgin Islands] . . . for operating various [Customs] activities in and for the U.S. Virgin Islands." J.A. 345. The 1994 MOA "identif[ied] those activities that are reimbursable," which included Customs' collection of tonnage and wharfage fees from cargo being imported and exported. J.A. 345, 347. Customs further agreed to report on the collection of these fees to the Virgin Islands. The 1994 MOA also included provisions for amending or revoking the agreement. *See* J.A. 353 ("Any change . . . shall be initiated by the requesting party in a written statement setting forth the exact nature and reason for the change."); J.A. 354 ("This MOA may be revoked by either party upon providing written notice to the other party 180 days prior to the proposed revocation date."). One of the statutes cited in the agreement for Customs' authority to enter into the 1994 MOA was 48 U.S.C. § 1469c.

The current dispute arose from Customs' increasing collection costs, which outpaced the collection of the disputed fees starting in 2004. This left VIPA without any proceeds from the disputed fees. In 2006, VIPA removed the instruction in its Marine Tariff Schedule that users should

pay the disputed fees to Customs.[1] But Customs continued to collect the fees. In 2007, VIPA sent a letter, approved by the Virgin Islands' governor, "appealing to [Customs] so that [VIPA] can start to collect" the disputed fees. J.A. 371. Customs "respectfully denie[d] VIPA's request" based on Customs' position that 48 U.S.C. §§ 1406h, 1406i, and 1642a, required it to collect the disputed fees as customs duties—a position the government abandoned below. J.A. 375–77. Following a series of letters and meetings between VIPA, the Virgin Islands, and Customs, VIPA sent a letter to Customs in February 2011, indicating that VIPA would start to collect the disputed fees on March 1, 2011. Customs thereafter ceased collecting the disputed fees and VIPA started to collect them instead.[2]

In 2012, VIPA sued Customs to recover the approximately $ 10 million in disputed fees that Customs collected from February 2008 to March 1, 2011.[3] The parties filed cross-motions for summary judgment, and the Claims Court denied VIPA's motion and granted the United States'

---

[1]    Before the 2006 amendment, the Marine Tariff Schedule instructed "[a]ll vessels using the facilities of the Virgin Islands Port Authority shall pay to the District Director, U.S. Customs" wharfage fees, and ship dues were to be paid to the "District Director of U.S. Customs." J.A. 11. The 2006 amendment, in relevant part, removed those references for users to pay these fees to Customs.

[2]    Eventually in 2014, the 1994 MOA was amended by Customs and the Virgin Islands to remove mention of wharfage and tonnage fees.

[3]    VIPA's basis for the choice of start date of Customs' unauthorized collection (February 2008) is unclear as it does not seem to be tied to any action VIPA or Customs took with respect to the disputed fees at issue here. VIPA's counsel also did not know why that start date was selected. Oral Arg. at 9:35–9:37.

motion. The only issue VIPA has appealed is whether Customs committed an illegal exaction by collecting the disputed fees allegedly without authorization from 2008 to 2011.[4] We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

DISCUSSION

We review the Claims Court's grant of summary judgment de novo, and summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. *8x8, Inc. v. United States*, 854 F.3d 1376, 1380 (Fed. Cir. 2017).

One way an illegal exaction occurs is when the "plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that was "improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1007 (Ct. Cl. 1967). "The amount [allegedly illegally] exacted and paid may be recovered whether the money was paid directly to the government, or was paid to others at the direction of the government to meet a governmental obligation" in contravention of law. *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1573 (Fed. Cir. 1996). VIPA argues that Customs committed an illegal exaction when it collected the disputed fees after its authority to do so was revoked in 2007. *See Eastport*, 372 F.2d at 1007–08; *Aerolineas*, 77 F.3d at 1572–74. The government argues that Customs' actions did not constitute an illegal exaction because it neither received money directly from VIPA nor

---

[4] VIPA abandoned its contract-based claims at summary judgment, and it did not appeal the Claims Court's grant of summary judgment to the government on the contracts issue and VIPA's takings claim.

required VIPA to pay a third party. *See Aerolineas*, 77 F.3d at 1578; *Camellia Apartments, Inc. v. United States*, 334 F.2d 667, 669 (Ct. Cl. 1964). We need not resolve the issue of whether Customs' collection constitutes an "in effect" illegal exaction because this is a merits issue, not a jurisdictional one. As discussed below, we conclude that VIPA's claim is without merit because Customs was authorized to collect the disputed fees and that this authority was not revoked during the time frame at issue here.

## I. Authorization

On its face, 48 U.S.C. § 1469c allows an agency or instrumentality of the United States (for example, Customs) to provide services to the government of a territory (for example, the Virgin Islands) on a reimbursable basis. The government does not suggest that it could provide reimbursable services without authorization by a territory's government under this statute. Instead, the government relies on the 1994 MOA with the Virgin Islands for Customs' authorization to collect the disputed fees. VIPA argues that the 1994 MOA could not be the source of authority because Customs was collecting the disputed fees before 1994. VIPA argues that its Marine Tariff Schedule, which has been in effect since 1968, was what authorized Customs' collection of the disputed fees, at least until 2006 when it was amended.

By its own terms, the 1994 MOA provided a "methodology for determining the costs chargeable to [the Virgin Islands] . . . for operating various [Customs] activities in and for the U.S. Virgin Islands." J.A. 345. It also "identif[ied] those activities that are reimbursable" including "[p]rocessing [imported and exported] cargo," which included collecting the "tonnage [and] wharfage" fees. J.A. 345, 347. Customs also agreed to report on the collection of these fees. One of the sources of authority for these activities cited in the agreement was 48 U.S.C. § 1469c. As VIPA recognized in its 2007 letter to Customs, the 1994

MOA was an agreement "for services to be provided" by Customs, including Customs' "collecti[on of] the following on behalf of the Government of the Virgin Islands: . . . tonnage and wharfage [fees]." J.A. 371. "The [1994 MOA] further allowed [Customs], based on a formula, to retain a portion of the funds collected to be compensated for its services." J.A. 371. On its face, the 1994 MOA provides authorization for Customs to collect the disputed fees and to reimburse itself for costs attendant to that service. Because we conclude that no reasonable fact-finder could conclude that the 1994 MOA did not authorize Customs' collection of the fees, there is no material dispute of fact on this issue.[5]

To the extent VIPA's Marine Tariff Schedule also constituted authorization for Customs to collect the disputed fees, that does not undermine our conclusion. It may be that Customs has had multiple overlapping sources of authorization throughout the years to collect the disputed fees, but the issue in this litigation is whether Customs had authority from February 2008 to March 1, 2011. The 1994 MOA provided authority during that time period, unless that authority was revoked.[6]

---

[5]     To the extent VIPA argues that it is entitled to further discovery on this issue, it did not move for such relief pursuant to Rule 56(d) of the Rules of the U.S. Court of Federal Claims.

[6]     The government contends that the 1994 MOA is "an agreement between two sovereigns that did not necessarily contemplate a lawsuit for contract damages" but instead merely "provided for a process whereby the parties would either" amend or revoke the agreement. United States, Response Br. at 31. Even if that is the case, the MOA nevertheless provided authorization for Customs to provide a service (collecting the fees) on a reimbursable basis under 48 U.S.C. § 1469c. Moreover, it does not make a difference that VIPA was not party to the 1994 MOA

## II. Revocation

VIPA argues that even if the 1994 MOA constitutes authorization for purposes of 48 U.S.C. § 1469c, that authority was revoked in 2007 before Customs collected the disputed fees from 2008 to 2011. The Claims Court stated that "VIPA's 2007 letter was not effective to revoke the 1994 MOA according to the terms of the MOA itself." J.A. 21. Here, principles of agency law provide guidance as to what is required to revoke authorization under 48 U.S.C. § 1469c. "The question [of authorization] is at least presumptively governed by principles of agency law . . . ." *Fed. Election Comm'n v. NRA Political Victory Fund*, 513 U.S. 88, 98 (1994). "When discussing the contours and scope of the common law, the Supreme Court has instructed that it is appropriate for us to look to the pertinent Restatement . . . ." *Commonwealth Edison Co. v. United States*, 271 F.3d 1327, 1353 (Fed. Cir. 2001) (en banc).

"[An agent's] authority is revoked or renounced by written or spoken words or other conduct which, reasonably interpreted, indicates that the principal no longer consents to have the agent act for him . . . ." Restatement (Second) of Agency § 119 cmt. a (1958). "[T]he meaning that may reasonably be inferred from [a manifestation of revocation] will reflect the context in which the manifestation is made . . . ." Restatement (Third) of Agency § 1.03 cmt. e (2006). "Between particular persons, prior dealings or an ongoing relationship frame the context in which manifestations are made and understood." *Id.* "The principal has power to revoke and the agent has power to renounce, although doing so is in violation of a contract between the

_____

because § 1469c requires authorization from the government of a territory, which Customs had from the Virgin Islands' agreement to the 1994 MOA.

parties and although the authority is expressed to be irrevocable." Restatement (Second) of Agency § 118 cmt. b.

The Claims Court's conclusion that VIPA could not revoke Customs' authority without revoking or amending the 1994 MOA is inconsistent with settled agency law that a principal may revoke an agent's authority even if such revocation is in violation of an agreement. The question here is whether Customs' authority under the 1994 MOA was revoked.

At the outset we note that the 2006 amendment to VIPA's Marine Tariff Schedule could not have revoked Customs' authority under the 1994 MOA. In 2006, VIPA removed its instructions for users to pay the disputed fees to Customs. The amended Marine Tariff Schedule did not otherwise indicate to whom the fees should be paid, and Customs continued to collect the fees until 2011. Based on Customs' historical practice of collecting the disputed fees, the equivocal meaning of VIPA's actions, and the separate ongoing vitality of the 1994 MOA, we conclude that this change in the Marine Tariff Schedule could not have reasonably indicated a revocation of authority under the 1994 MOA.[7]

Instead, VIPA relies on its letter sent to Customs in 2007 as revoking Customs' authority. The letter indicated that VIPA was "appealing to [Customs] so that [VIPA] can start to collect port fees and charges as listed in its tariff." J.A. 371. The letter also noted that VIPA "stands ready to submit any additional information [Customs] may require,

---

[7]    There is also the issue of whether VIPA's actions could be attributable to the government of a territory, i.e., the Virgin Islands, under 48 U.S.C. § 1469c. We need not decide that issue as we conclude that VIPA's change to the tariff schedule did not constitute an effective revocation of authority for Customs to collect the disputed fees.

and is willing to meet to discuss this matter." J.A. 372. Customs responded on August 24, 2007, "respectfully den[ying] VIPA's request" because it believed it was required under federal law, specifically identifying 48 U.S.C. §§ 1406h, 1406i, 1642a, to collect the disputed fees as customs duties. J.A. 375–76. It noted that "[i]f VIPA disagrees with [Customs'] position outlined above, VIPA is welcome to provide [Customs] with evidence to the contrary." J.A. 376. The Virgin Islands' governor's signature with VIPA's 2007 letter indicates that the Virgin Islands agreed to VIPA's request.

The 2007 letter cannot reasonably be interpreted as revoking Customs' authority and therefore does not implicate a dispute of material fact. The 2007 letter merely stated that VIPA was "*appealing* to [Customs] so that it can start to collect" wharfage and tonnage fees. J.A. 371 (emphasis added). And VIPA indicated it was "ready to submit any additional information [Customs] may require, and is *willing to meet to discuss* this matter." J.A. 372 (emphasis added). Thus, the letter indicated that VIPA and the Virgin Islands were willing to discuss the issue of whether or not Customs would continue to collect the disputed fees, not that the authority was being revoked. *Compare Gov't Guarantee Fund of Republic of Finland v. Hyatt Corp.*, 95 F.3d 291, 306 (3d Cir. 1996) (concluding that a letter stating the agreement was "void, terminated, and/or expired" and demanding "immediate[] surrender" of the property indicated that the agency relationship was terminated). This conclusion is supported by communications after 2007 between the Virgin Islands and Customs, which focused on amending the 1994 MOA to change the collection of the disputed fees.

Moreover, the 1994 MOA clearly laid out a process by which the Virgin Islands could either revoke or amend the agreement. It provided that "[t]his MOA may be revoked by either party upon providing written notice to the other party 180 days prior to the *proposed revocation date*." J.A.

354 (emphasis added). "Any change required by the [parties] . . . in the provisions of this MOA shall be *initiated* by the requesting party in a written statement setting forth the exact nature and reason for the change." J.A. 353 (emphasis added). To be sure, as noted earlier, an agency relationship can be terminated even in violation of an agreement. But absent a clear statement to the contrary, it was reasonable for Customs to assume that if the Virgin Islands wanted to revoke Customs' authority, revocation would be accomplished by invoking the specific revocation provision in the 1994 MOA. VIPA's reliance on the 2007 letter is therefore misplaced, as it cannot be reasonably interpreted as revoking Customs' authority.

Finally, VIPA argues that it was futile for it to attempt to revoke Customs' collection authority under the 1994 MOA because Customs claimed an obligation to collect based on other statutory sources, 48 U.S.C. §§ 1406h, 1406i, 1642a, claims of authority that Customs has since abandoned. VIPA claims that "[h]aving declared that its collection of VIPA's fees would continue with or without VIPA's authorization, [Customs] effectively mooted any effort by VIPA or the USVI Government to amend the 1994 MOA, because under [Customs'] legal position such an amendment would not have stopped [Customs] from collecting and retaining VIPA's fees." VIPA, Open. Br. at 11.

In the regulatory takings context, an erroneous government claim of right does not constitute a taking unless there is "a prohibition or . . . coercive government action." *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1311 (Fed. Cir. 2015). "[G]overnment action devoid of coercion, legal threat, regulatory restriction, or any binding obligation [does not] effect a regulatory taking." *Id*. Coercion of the claimant is of course not typically an element of an illegal exaction claim, though coercion might in the present context excuse action to revoke the government's authority. But, as in the takings context, a mere claim of right is not coercive and here, there was neither a prohibition nor

coercive government action. Indeed, VIPA disputed Customs' claim that statutes required it to collect the disputed fees, and VIPA never suggested until the lawsuit began it was coerced into foregoing revocation of Customs' authority under the 1994 MOA. The government's claim of statutory compulsion did not prevent VIPA from challenging the government's claim of statutory authority by revoking the government's authority under the 1994 MOA.

## CONCLUSION

Because Customs was authorized under 48 U.S.C. § 1469c, in combination with the 1994 MOA, to collect the disputed fees from February 2008 to March 1, 2011, and because that authority was not revoked during that time, we affirm the Claims Court's grant of the United States' motion for summary judgment.

## **AFFIRMED**

### COSTS

No costs.