# United States Court of Appeals for the Federal Circuit

---

**THE BOEING COMPANY,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-2148

---

Appeal from the United States Court of Federal Claims in No. 1:17-cv-01969-PEC, Judge Patricia E. Campbell-Smith.

---

Decided: August 10, 2020

---

MICHAEL W. KIRK, Cooper & Kirk, PLLC, Washington, DC, argued for plaintiff-appellant. Also represented by CHARLES J. COOPER, JOHN DAVID OHLENDORF; SUZETTE DERREVERE, The Boeing Company, Arlington, VA; SETH LOCKE, Perkins Coie, LLP, Washington, DC.

ERIN MURDOCK-PARK, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee. Also represented by ETHAN P. DAVIS, ELIZABETH MARIE HOSFORD, ROBERT EDWARD KIRSCHMAN, JR.

---

Before MOORE, TARANTO, and CHEN, *Circuit Judges.*

TARANTO, *Circuit Judge.*

From 1992 to 2015, the Boeing Company entered into numerous contracts with the United States Department of Defense, among them the contract at issue in this case. In 2011, Boeing permissibly changed multiple cost accounting practices simultaneously; some of the changes raised costs to the government, whereas others lowered costs to the government. In late 2016, the Defense Contract Management Agency, invoking Federal Acquisition Regulation (FAR) 30.606, 48 C.F.R. § 30.606, determined the amount of the cost-increasing changes for the present contract and demanded that Boeing pay the government that amount plus interest. Boeing began doing so.

In 2017, Boeing filed an action in the Court of Federal Claims to seek recovery of the amounts thus paid, asserting that the government, in following FAR 30.606, committed a breach of contract and effected an illegal exaction. Boeing's core argument, applicable to both claims, is that, although FAR 30.606 undisputedly required the Defense Department to act as it did, that regulation is unlawful—principally because it is contrary to 41 U.S.C. § 1503(b) (and also for procedural reasons). According to Boeing, that provision of the Cost Accounting Standards (CAS) statute, which is incorporated into the contract at issue, requires that simultaneously adopted cost-increasing and cost-lowering changes in accounting practices be considered as a group, with the cost reductions offsetting the cost increases. Boeing argues that, by following FAR 30.606's command to disregard the cost-lowering changes and bill Boeing for the cost-increasing changes alone, the government unlawfully charged it too much.

The trial court held that Boeing had waived its breach of contract claim by failing to object to FAR 30.606 before entering into the relevant contracts. *Boeing Co. v. United*

*States*, 143 Fed. Cl. 298, 307–15 (2019). The trial court also determined that it lacked jurisdiction to consider Boeing's illegal exaction claim because the claim was not based on a "money-mandating" statute. *Id.* at 303–07. We now reverse and remand, concluding that the trial court misapplied the doctrine of waiver and misinterpreted the jurisdictional standard for illegal exaction claims.

I

A

The federal government has long entered into contracts under which amounts it pays to contractors are based on the contractors' costs in performing the contracts. *See, e.g.*, *Lockheed Aircraft Corp. v. United States*, 375 F.2d 786 (Ct. Cl. 1967). In an effort to regularize cost-accounting practices relevant to such contracts, the Office of Federal Procurement Policy Act Amendments of 1988 (the CAS Act) established the CAS Board within the Office of Federal Procurement Policy. Pub. L. 100-679, § 5, 102 Stat. 4055, 4058–63 (1988) (originally codified at 41 U.S.C. § 422, but now codified at 41 U.S.C. §§ 1501–06). The CAS Act gave the Board "exclusive authority to prescribe, amend, and rescind cost accounting standards." 41 U.S.C. § 1502(a)(1). Standards promulgated by the Board are "mandatory for use by all executive agencies and by contractors and subcontractors in estimating, accumulating, and reporting costs in connection with the pricing and administration of, and settlement of disputes concerning, all negotiated prime contract and subcontract procurements with the Federal Government in excess of the amount set forth in section 2306a(a)(1)(A)(i) of title 10," which refers to contracts worth more than $2 million. *Id.*, § 1502(b)(1)(B); *see* 10 U.S.C. § 2306a(a)(1)(A)(i).

The CAS Act directed the Board to establish regulations "requir[ing] contractors and subcontractors as a condition of contracting with the Federal Government to . . . agree to a contract price adjustment, with interest, for any

increased costs paid to the contractor or subcontractor by the Federal Government because of a change in the contractor's or subcontractor's cost accounting practices." 41 U.S.C. § 1502(f). In accordance with that mandate, the Board promulgated FAR 9903.201-4, which requires contracting officers to insert, in each CAS-covered contract, a clause that "requires the contractor to comply with all CAS specified in [48 C.F.R. pt. 9904]." 48 C.F.R. § 9903.201-4(a)(2). The required clause states that "the provisions of [part] 9903 are incorporated herein by reference" and that a contractor shall "[c]omply with all CAS, including any modifications and interpretations indicated thereto contained in part 9904" as of certain times and "any CAS (or modifications to CAS) which hereafter become applicable to a contract." 48 C.F.R. § 9903.201-4 (clause sections (a)(1) and (a)(3)). As relevant here, the clause also requires the contractor, upon making a "change to a cost accounting practice," to "negotiate an equitable adjustment . . . ." *Id.* (clause section (a)(4)(iii)). Notably for purposes of this case, another regulation, FAR 52.230-2, provides for insertion of a clause that incorporates 48 C.F.R. part 9903 by reference and that otherwise is the same for present purposes as the clause set out in FAR 9903.201-4. *See* 48 C.F.R. § 52.230-2.

An additional regulation, FAR 52.230-6, entitled "Administration of Cost Accounting Standards," establishes a framework for determining the amount of an equitable adjustment; as relevant here, it requires that every CAS contract contain a detailed clause addressed to that topic. 48 C.F.R. § 52.230-6. Each relevant agency must appoint a "Cognizant Federal Agency Official" (CFAO), *i.e.*, a contracting officer responsible for implementing CAS provisions that govern the agency's contracts. 48 C.F.R. § 52.230-6 (clause section (a)). In that role, the designated contracting officer coordinates the agency's response to changes in cost accounting practices.

A contractor must "[s]ubmit to the CFAO a description of any cost accounting practice change . . . and any written statement that the cost impact of the change is immaterial." *Id.*, § 52.230-6 (clause section (b)). As relevant here, upon determining that a change complies with the CAS but is "undesirable," the contracting officer must classify the change as "unilateral" and inform the contractor that "the Government will pay no aggregate increased costs." *Id.* (clause section (a)). The contracting officer may request that the contractor submit a "general dollar magnitude (GDM) proposal" calculating the "cost impact" of the changes. *See id.* (clause section (c)(1)) (GDM proposal must be "in accordance with paragraph (d) or (g) of this clause"); *id.* (clause section (d)(1)) ("[T]he GDM proposal shall . . . [c]alculate the cost impact in accordance with paragraph (f) of this clause."). For a unilateral change, the proposal must include an estimate of the "increased cost to the Government in the aggregate." *Id.* (clause section (f)(2)(iv)).

At the heart of this case is one further regulation, FAR 30.606, entitled "Resolving cost impacts." 48 C.F.R. § 30.606. Although FAR 52.230-6 and its required contract clause do not refer to FAR 30.606, it is undisputed that, in deciding how to deal with the cost impacts of changes, "the Government was required to follow FAR 30.606 when administering the Contract." U.S. Br. at 45 (citing 41 U.S.C. § 1121(c)(1)); *id.* ("FAR 30.606 is mandatory"); *id.* at 50 ("We do not dispute that FAR 30.606 could not be waived, nor that contracting officers are precluded from granting such a waiver."). FAR 30.606 gives the contracting officer discretion to "adjust[] a single contract, several but not all contracts, all contracts, or any other suitable method." 48 C.F.R. § 30.606(a)(2). But the regulation limits that discretion in a respect central to the dispute in this case. It instructs the contracting officer not to "combine the cost impacts of . . . . [o]ne or more unilateral changes" "unless all of the cost impacts are increased costs to the government." *Id.*, § 30.606(a)(3)(ii)(A). As is undisputed, that

provision bars offsetting increases in costs from some changes with reductions in costs from others.

Under FAR 52.230-6, if the contracting officer determines that the unilateral, undesirable changes have caused an "aggregate increased cost," the contractor must "[r]epay the Government" an amount equal to the aggregate increased cost. *Id.*, § 52.230-6 (clause section (k)(2)). Any disagreement over repayment, the CAS statute declares, "will constitute a dispute under chapter 71 of this title," *i.e.*, a dispute under the Contract Disputes Act. 41 U.S.C. § 1503(a); *see id.*, §§ 7101–09.

B

From 1992 to 2015, Boeing, through its Fixed Wing Accounting Business Unit segment of its Defense, Space & Security division, entered into numerous contracts with the federal government. The contract at issue here is Contract No. N00019-09-C-0019 (the C19 contract), based on a solicitation issued by the Naval Air Systems Command and awarded in late 2008 to McDonnell Douglas Corporation, which was by then part of Boeing and has been treated by the parties as within Fixed Wing's aegis. J.A. 404. The award recites an "amount" of roughly $67 million and states that the contract would be administered, on the government's side, by the Defense Contract Management Agency. *Id.* It is undisputed before us that the contract is governed by CAS. The contract incorporates various clauses either by reference or by full text. J.A. 1013–23; J.A. 405. The clauses set out in FAR 52.230-2 and 52.230-6 are among those incorporated; FAR 30.606 is not. J.A. 1013–23; J.A. 405.

In October 2010, Boeing informed the Defense Contract Management Agency's designated contracting officer that Fixed Wing was planning to implement simultaneously, on January 1, 2011, several changes to its cost accounting practices. The contracting officer deemed eight of those changes to be undesirable "unilateral changes," designated

the C19 contract as representative, and asked Boeing to submit a general magnitude dollar proposal. In its proposal, Boeing estimated that two changes—GT-2011-06 and GT-2011-07—would increase the government's costs by $888,000 ($940,007 after factoring in Boeing's profits). But Boeing estimated that two other changes—GT-2011-04 and GT-2011-05—would save the government $2,284,000. Because the net effect of the changes was to save the government $1,396,000 ($1,489,000 after factoring in Boeing's profits), Boeing duly contended that it need not make any payment because there was no "aggregate increased cost." FAR 52.230-6(k)(2).

On December 21, 2016, a Divisional Administrative Contracting Officer (DACO) of the Defense Contract Management Agency determined, in a "Final Decision," that Boeing owed the government $1,064,773. J.A. 67. She drew that conclusion by limiting her calculation to the "[t]wo of the eight changes . . . [that] materially . . . increase costs to the Government," disregarding the other, cost-saving changes. J.A. 68. She ruled that Boeing had to pay the government $940,007, plus interest of $124,776 (through December 2016). *Id.*; *see also* J.A. 64–65 (denying reconsideration). To fulfill that obligation, Boeing began paying the government $8,900 per month. J.A. 55.

C

On December 18, 2017, Boeing filed an action in the Court of Federal Claims under the Contract Disputes Act. *See* 41 U.S.C. § 7104(b) ("[I]n lieu of appealing the decision of a contracting officer under section 7103 of this title to an agency board, a contractor may bring an action directly on the claim in the United States Court of Federal Claims."). Boeing alleged that the government breached the C19 contract, with its CAS-compliance clause, by failing to "negotiate an equitable adjustment," FAR 9903.201-4, in accordance with the CAS statute. In particular, Boeing renewed its argument that FAR 30.606, which forbids the

offsetting of cost increases and cost reductions from simultaneous changes in cost accounting practices, is unlawful, including because it is counter to the CAS statute's general rule that "[t]he Federal Government may not recover costs greater than the aggregate increased cost to the Federal Government," 41 U.S.C. § 1503(b). *See* J.A. 57; *see also* J.A. 58 (arguing that FAR 30.606 was promulgated without "adequate notice and comment"). Alternatively, Boeing alleged, the government's "demand for payment," "in direct violation of 41 U.S.C. § 1503(b)," was an "illegal exaction." J.A. 60.

Boeing filed a motion for judgment on the pleadings. The government opposed Boeing's motion and filed its own cross-motions to dismiss (as to the illegal exaction claim) and for summary judgment (as to the contract claim). The trial court granted the government's motions.

The government's argument on the contract claim was that, by failing to challenge the legality of FAR 30.606 before entering into the C19 contract, Boeing had waived its breach of contract claim that depended on challenging FAR 30.606 as unlawful. The trial court agreed, characterizing the asserted conflict between FAR 30.606 and the CAS statute as a "patent ambiguity in [Boeing's] contract with the government." *Boeing*, 143 Fed. Cl. at 309. The court ruled that "[b]ecause Boeing did not seek clarification, before award, of the conflict it saw between the CAS statute, the CAS clause and FAR 30.606, its contract claims are foreclosed as a matter of law." *Id.* at 310.

The government's argument on the illegal exaction claim was that jurisdiction under the Tucker Act, 28 U.S.C. § 1491(a)(1), was lacking because the CAS Act, on which the allegation of illegality rested, is not a money-mandating statute. The trial court agreed. Relying on *Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005), the court stated that Boeing was required to "show that 41 U.S.C. § 1503(b) is money-mandating to establish jurisdiction for

its illegal exaction claim." *Boeing*, 143 Fed. Cl. at 304. The court concluded that Boeing had not done so and, therefore, "the illegal exaction claim . . . must be dismissed for lack of subject matter jurisdiction." *Id.* at 307.

Boeing timely appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(3). We review the Court of Federal Claims' legal conclusions de novo and its factual findings for clear error. *Love Terminal Partners, L.P. v. United States*, 889 F.3d 1331, 1340 (Fed. Cir. 2018).

II

Boeing contends that the trial court incorrectly ruled that Boeing waived its challenge to the lawfulness of FAR 30.606. We agree. Although Boeing advances several rationales for the inapplicability of waiver, we need not go beyond the following. A pre-award objection by Boeing to the Defense Department would have been futile, as the government concededly could not lawfully have declared FAR 30.606 inapplicable in entering into the contract. Our precedents do not require, to avoid waiver, that the contractor have pursued judicial avenues of relief before the award. To the extent that the government even urges adoption of such a requirement here, it has provided no sound basis for doing so in this case: it has not identified a judicial avenue through which a ruling on the merits of the objection was assuredly available. We therefore reverse the trial court's waiver ruling.

A

The basis for waiver adopted by the trial court and defended by the government is what the government labels, on the first page of its brief to this court, "the *Blue & Gold* waiver rule," referring to this court's decision in *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007). U.S. Br. at 1. In *Blue & Gold*, which involved a bid protest, we drew on precedents involving certain contract ambiguities and concluded: "a party who has the

opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Blue & Gold*, 492 F.3d at 1313; *see COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012) (extending *Blue & Gold* to "situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so"). More generally, we have ruled that a waiver exists in certain circumstances where contract terms contain a "patent" ambiguity or defect, including an obvious omission, inconsistency, or discrepancy of significance, and the contractor or bidder who later challenges those contract terms in court had not properly raised the problem to the agency during the contract-formation process. *See Inserso Corporation v. United States*, 961 F.3d 1343, 1349–52 (Fed. Cir. 2020); *K-Con, Inc. v. Sec'y of Army*, 908 F.3d 719, 721–22 (Fed. Cir. 2018); *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1312 (Fed. Cir. 2016); *E.L. Hamm & Assocs., Inc. v. England*, 379 F.3d 1334, 1341 (Fed. Cir. 2004); *Jowett, Inc. v. United States*, 234 F.3d 1365, 1368 n.2 (Fed. Cir. 2000).

Boeing argues against applicability of that doctrine to this case on several grounds. It argues, for example, that there was no *contract* defect or ambiguity because, whereas the contract includes certain clauses requiring compliance with the CAS statute, it does not include a clause requiring compliance with FAR 30.606. *See supra* p. 6; Boeing Br. at 31–36. Boeing also contends that the doctrine is inapplicable where a challenge rests on a statute that is protective of the contractor and not primarily of the government, an exception that applies, Boeing says, to 41 U.S.C. § 1503(b). Boeing Br. at 46–52. We need not and do not reach either of those contentions. Instead, we address Boeing's primary contention, Boeing Br. at 21–31, 37–45, and conclude that there was no waiver here because the government has not shown that Boeing bypassed an avenue of relief on the

merits from the agency—indeed, has not even shown that Boeing bypassed a judicial forum that would adjudicate its contention on the merits.

As already noted, the government here concedes that, when entering into the contract at issue, its adherence to FAR 30.606 was "mandatory," "FAR 30.606 could not be waived," and "contracting officers are precluded from granting such a waiver." U.S. Br. at 45, 50. In other words, it is undisputed that, if Boeing had objected to FAR 30.606 during the negotiations to enter into the contract, the agency would have had to reject the objection. The agency could not lawfully have given Boeing the relief of rejecting application of FAR 30.606 to the contract. *See* Oral Arg. at 13:20–14:25 (government counsel stating that FAR 30.606 is "not something that the contracting officer has discretion" to apply or not to apply).

Under our cases, as the government seems to acknowledge at one point, it is what Boeing said or did not say *to the agency* before entering into the contract that matters for purposes of the waiver doctrine. *See* U.S. Br. at 51 ("Whether Boeing could have challenged FAR 30.606 in another forum through an APA action or through a pre-award bid protest is irrelevant to whether Boeing improperly stayed silent—before signing the Contract—on the purported conflict between the regulation and the CAS."). The government has not pointed to any precedent of this court under the contract waiver doctrine in which we have found waiver, or declared waiver to be available, despite the inability of the agency itself to grant the relief that the party later sought in court. None of this court's precedents on which the government relies in addressing Boeing's primary contention about contract waiver involved such a circumstance; the government does not argue otherwise.[1]

---

[1]    In the portions of its brief directed to the Boeing argument we are addressing, the government cites *K-Con*,

The same is true of additional cases of ours on which the trial court relied in the corresponding portions of its opinion.[2]

Notably, we emphasized the significance of the availability of agency relief in one of the cases principally relied on by the government and the trial court, *American Telephone & Telegraph Co. v. United States* (*AT&T II*), 307 F.3d 1374 (Fed. Cir. 2002). There, we held that AT&T had waived its challenge to the fixed-price nature of a $34.5 million contract. *Id.* at 1376. AT&T sought to reform the contract, invoking a regulation that, supporting AT&T's position in court, directed agencies not to enter fixed-price contracts greater than $10 million. *Id.* We noted that the agency, in negotiating the contract, readily could have adopted the form of contract AT&T later sought in court. *Id.* at 1376, 1379. We concluded that "the proper time for AT&T to have raised the issues that it now

---

*supra*; *Per Aarsleff, supra*; *Blue & Gold, supra*; *E.L. Hamm, supra*; *American Telephone & Telegraph Co. v. United States*, 307 F.3d 1374 (Fed. Cir. 2002) (*AT&T II*); *Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375 (Fed. Cir. 2000); *Whittaker Elec. Sys. v. Dalton*, 124 F.3d 1443 (Fed. Cir. 1997); *United Int'l Investigative Servs. v. United States*, 109 F.3d 734 (Fed. Cir. 1997); *Cmty. Heating & Plumbing Co. v. Kelso*, 987 F.2d 1575 (Fed. Cir. 1993); and *Space Corp. v. United States*, 470 F.2d 536 (Ct. Cl. 1972). *See* U.S. Br. at 23, 31–33, 36, 41–43, 52.

[2] In those portions of its opinion, the trial court cited, besides some of the cases cited *supra* n.1, *Triax Pac., Inc. v. West*, 130 F.3d 1469 (Fed. Cir. 1997); *Statistica, Inc. v. Christopher*, 102 F.3d 1577 (Fed. Cir. 1996); *Interwest Constr. v. Brown*, 29 F.3d 611 (Fed. Cir. 1994); *Newsom v. United States*, 676 F.2d 647 (Ct. Cl. 1982); and *E. Walters & Co. v. United States*, 576 F.2d 362 (Ct. Cl. 1978). *See Boeing*, 143 Fed. Cl. at 309–10, 313–14.

presents was at the time of the contract negotiation, *when effective remedy was available.*" *Id.* at 1381 (emphasis added).[3]

Even more notably, where the agency, during contracting, could not have accepted the objection later raised by the plaintiff in court, we have rejected a government argument for waiver precisely because of the disability. In *GHS Health Maintenance Organization, Inc. v. United States* (*GHS II*), we determined that a contractor had not waived its challenge to a regulation. 536 F.3d 1293, 1295 (Fed. Cir. 2008). Noting that the contract contained the language of the regulation, the government argued that the contractor had consented to the regulation, and thereby waived its challenge, by signing the contract. *Id.* at 1306. We rejected this argument as "frivolous" on the simple ground that the regulation "was non-negotiable." *Id.*

---

[3] In *Blue & Gold*, we held that Blue & Gold, a losing bidder, waived the contention that the agency was required to include in the solicitation a requirement of compliance with an employee-pay statute, because Blue & Gold did not make that objection to the agency during the bidding process. In so ruling, we discussed an agency regulation relevant to whether Blue & Gold should have been aware of a general agency practice, but we did not suggest that the regulation barred the agency from including in the solicitation the requirement Blue & Gold later urged in court. Indeed, we noted that, after the award was made (to a rival bidder), the Park Service agreed to apply the statute to the contract, 492 F.3d at 1316, with no apparent change in the regulation. Blue & Gold, for its part, made no contrary contention; in fact, it stated that the regulation "nowhere mentions the" statute "or clearly states" that the contract at issue was outside the statute. Reply Br. of Appellant at 8, *Blue & Gold*, 492 F.3d 1308 (Fed. Cir. 2007) (No. 06-5064), 2006 WL 3243586.

*GHS II* cannot be disregarded as too abbreviated in its analysis, which is clear and to the point. It also is consistent with all the relevant precedent identified to us or of which we are aware. It reflects the contract waiver doctrine's origin in the policy of ensuring that two negotiating parties (whether private or governmental) do what *they* are able to do to clear up patent ambiguities or defects before formation, thus helping to reduce future litigation and allowing expeditious contract formation. *See Blue & Gold*, 492 F.3d at 1313–15. In addition, with *Blue & Gold* having itself looked to "analogous" doctrines, *id.* at 1314, we note that *GHS II* aligns with the familiar "futility" exception to related requirements for preserving a challenge by first presenting the matter to an agency. *See Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000); *McCarthy v. Madigan*, 503 U.S. 140, 147–48 (1992); *Montana Nat. Bank of Billings v. Yellowstone County*, 276 U.S. 499, 505 (1928).

Under our case law, we conclude, there was no waiver.

B

*GHS II* does not specifically discuss whether waiver could be found where, though relief from the agency was not available, a contractor or bidder bypassed, during the contract-formation process, an opportunity for a *judicial* ruling on the merits of the objection later asserted in court. It is not clear, however, whether the government is contending that bypassing a judicial avenue of relief is a ground for waiver, generally or in this case. *Compare* U.S. Br. at 51 ("Whether Boeing could have challenged FAR 30.606 in another forum through an APA action or through a pre-award bid protest is irrelevant to whether Boeing improperly stayed silent—before signing the Contract—on the purported conflict between the regulation and the CAS.") *with id.* at 36 n.12 ("Boeing had the choice to protest the terms of the solicitation—including a challenge to FAR 30.606—or to raise its challenge in an [APA]

claim.") and Oral Arg. at 14:25–18:45 (government urging that Boeing should have sought judicial relief before entering into contract). Accordingly, we explain here only why the government's argument along these lines falls short of justifying any expansion of the waiver doctrine to support a waiver in this case.

We do not decide whether failure to pursue a judicial remedy could ever support a determination of waiver in the contract context. We decide merely that we will not create such a new basis for waiver where the government has not identified a judicial forum in which the plaintiff would clearly have been entitled, during the contract-formation process, to obtain a ruling on the merits of the objection it has raised in its later contract case. This conclusion reflects the general principle that forfeiture involves a "failure to make timely assertion of the right *before a tribunal having jurisdiction to determine it.*" *Yakus v. United States*, 321 U.S. 414, 444 (1944) (emphasis added); *see United States v. Olano*, 507 U.S. 725, 731 (1993) (reiterating *Yakus* statement of forfeiture principle).

The government mentions just two possible paths Boeing might have taken in court during contract formation: an action under the APA, 5 U.S.C. §§ 702, 704, and a bid protest action, 28 U.S.C. § 1491(b)(1). U.S. Br. 36 n.12, 51. But the government never asserts, let alone establishes, that Boeing would have been entitled to a ruling on the merits of its challenge to FAR 30.606 had it pursued either of those paths in 2008, when the contract at issue was negotiated. There are evident reasons to doubt any such entitlement, but the government has not meaningfully addressed such obstacles, saying no more than that it was up to Boeing to try to secure judicial relief. That response is inadequate for the government to meet its burden to establish a waiver through failure to seek judicial relief here, even if we assume (without deciding) that such a failure could support a contract-waiver holding in other situations.

Without being comprehensive, we briefly identify some of the apparent obstacles, which are related to each other.

The CAS statute expressly provides that judicial resolution of disputes over "contract price adjustment[s]" shall take place under the Contract Disputes Act (CDA), 41 U.S.C. §§ 7101–09. 41 U.S.C. § 1502(a). That description fits Boeing's challenge: Boeing and the government disagree about the proper contract price adjustment to reflect Boeing's post-contract-formation 2011 changes in its cost accounting practices. The government accepts that a pre-formation action would be outside the CDA. *See* U.S. Br. 52–53 (stating that "to raise a CDA claim Boeing must first *have* a contract") (citing 41 U.S.C. § 7102(a)). Yet the government has not explained how the statutory routing of the particular dispute in this matter to the CDA leaves open an alternative, non-CDA, pre-formation route of judicial relief. *Cf. Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (ruling that a "detailed structure for reviewing violations" of a statutory provision or regulation precluded a "pre-enforcement challenge"); *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74–75 (1996) (statutory scheme precludes *Ex parte Young* action); *Schweiker v. Chilicky*, 487 U.S. 412, 422–23 (1988) (statutory scheme precludes *Bivens* action).

The CAS statute specifically addresses the APA. In 41 U.S.C. § 1502(g), the statute declares that "[f]unctions exercised under this chapter are not subject to sections 551, 553 to 559, and 701 to 706 of title 5," thereby excluding coverage under the APA's judicial review provisions, codified at 5 U.S.C. §§ 701–706. The government has not explained how a pre-formation APA action to contest the lawfulness of FAR 30.606 as to a contract price adjustment would fall outside that statutory exclusion of APA coverage.

As to the bid protest statute, this court has ruled that a "matter of contract administration . . . can only be

challenged under the Contract Disputes Act," not in a pre-award bid protest. *Coast Prof'l, Inc. v. United States, Fin. Mgmt. Sys., Inc.*, 828 F.3d 1349, 1355 (Fed. Cir. 2016). Boeing's challenge appears on its face to involve a matter of contract administration: it objects to the government following FAR 30.606 to determine the amount of a price adjustment when Boeing chose to adopt changes in cost accounting practices during the performance of the contract. The government has not explained why this particular dispute could have been brought to court under the bid protest statute before the contract was formed, rather than under the CDA if and when FAR 30.606 was applied in a way adverse to Boeing during contract performance.[4]

Indeed, there is reason to doubt that any pre-formation challenge to FAR 30.606 would have been ripe for judicial review, under either of the two statutory provisions the government mentions. A claim is "not ripe for judicial review when it is contingent upon future events that may or may not occur." *Systems Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1383 (Fed. Cir. 2012) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985)). Ripeness typically turns on (1) "the fitness

---

[4] We recently held that the Court of Federal Claims had jurisdiction under the bid protest statute, 28 U.S.C. § 1491(b)(1), to hear a plaintiff's challenge to a clear government position about a requirement that would likely make the plaintiff ineligible to compete for likely future government procurements for which it was likely to submit bids. *Acetris Health, LLC v. United States*, 949 F.3d 719, 727–28 (Fed. Cir. 2020); *id.* at 727 ("Acetris has standing because the government has taken a definitive position as to the interpretation of [statutory and regulatory provisions] that would exclude Acetris from future procurements for other products on which it is a likely bidder."). The government has not shown that *Acetris* applies here.

of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration," *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967), with the first factor focused on "whether the challenged conduct constitutes a final agency action," *Systems Application*, 691 F.3d at 1384. The government has not shown how Boeing could reliably have met the ripeness standard in 2008, well before it made the 2011 changes in its cost accounting practices and before the Defense Department made a decision under FAR 30.606 that would concretely harm Boeing, which depended on the particular changes.

In short, the government has not sufficiently explained how and where Boeing could have sought pre-award judicial review of FAR 30.606. At least in this circumstance, we see no basis for departing from our consistent precedent limiting the contract waiver doctrine to an objection that the agency itself could have resolved favorably to the objector if the objection had merit. We therefore hold that the trial court erred in ruling that Boeing waived its challenge.

## III

Boeing also contends that the trial court, in ruling that it lacked jurisdiction over the "illegal exaction" claim, mistakenly required that the asserted basis of illegality be a "money-mandating" statute. We agree with Boeing.

## A

Case law involving the Tucker Act, 28 U.S.C. § 1491(a), has long distinguished three types of claims against the federal government: contractual claims, illegal-exaction claims, and money-mandating-statute claims. Our predecessor court made this distinction in *Eastport S.S. Corp. v. United States*, stating that "the non-contractual claims we consider under Section 1491 can be divided into two somewhat overlapping classes—those in which the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum; and those

demands in which money has not been paid but the plaintiff asserts that he is nevertheless entitled to a payment from the treasury." 372 F.2d 1002, 1007 (Ct. Cl. 1967) (en banc). The Supreme Court endorsed that formulation in *United States v. Testan*, 424 U.S. 392, 400 (1976). Since then, we have repeated that the "underlying monetary claims are of three types." *See Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298, 1301 (Fed. Cir. 2004); *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572–73 (Fed. Cir. 1996).

"One way an illegal exaction occurs," we have stated, "is when the 'plaintiff has paid money over to the Government . . . and seeks return of all or part of that sum' that was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Virgin Islands Port Authority v. United States*, 922 F.3d 1328, 1333 (Fed. Cir. 2019) (quoting *Eastport S.S.*, 372 F.2d at 1007). Allegations of subject matter jurisdiction, to suffice, must satisfy a relatively low standard—must exceed a threshold that "has been equated with such concepts as 'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' and 'obviously without merit.'" *Shapiro v. McManus*, 136 S. Ct. 450, 456 (2015) (internal quotations omitted). Thus, to establish Tucker Act jurisdiction for an illegal exaction claim, a party that has paid money over to the government and seeks its return must make a non-frivolous allegation that the government, in obtaining the money, has violated the Constitution, a statute, or a regulation.

Under this standard, Boeing has established jurisdiction for its illegal exaction claim. Boeing alleged that the government "demanded that Boeing pay it . . . $940,007" to cover the "increased costs caused by two of the changes," that the government "also demanded $124,766 in compound interest," and that Boeing had already "paid $71,276 to the Government." J.A. 55. And Boeing alleged that the government's "demand for payment of $1,064,773

[$940,007 plus $124,766] is . . . in direct violation of 41 U.S.C. § 1503(b), which requires that the Government 'may not recover costs greater than the aggregate increased cost to the Federal Government.'" J.A. 60. In short, Boeing alleged that the government has demanded and taken Boeing's money in violation of a statute. Whatever its ultimate merits, this allegation suffices for jurisdiction to adjudicate the illegal exaction claim.

In reaching a contrary conclusion, the trial court relied on our decision in *Norman v. United States*, 429 F.3d 1081, 1095 (Fed. Cir. 2005). There, we stated that "[t]o invoke Tucker Act jurisdiction over an illegal exaction claim, a claimant must demonstrate that the statute or provision causing the exaction itself provides, either expressly or by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully exacted.'" *Id.* (quoting *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369, 1373 (Fed. Cir. 2000)). According to the trial court, that statement requires Boeing to "show that 41 U.S.C. § 1503(b) is money-mandating to establish jurisdiction for its illegal exaction claim." *Boeing*, 143 Fed. Cl. at 304.

The trial court read more into the *Norman* statement than is proper given the otherwise-clear law, from *Eastport S.S.* through *Testan* through later cases of this court, applying the requirement of a "money-mandating" statute only to claims for money damages for government action different from recovery of money paid over to the United States under an illegal exaction. *See Ontario Power*, 369 F.3d at 1301. Although *Norman* did not involve a claim based on money paid over to the government, it used the phrase "illegal exaction" to refer to a government act delineating certain land as wetlands and to the plaintiff's own expenditure of money for fees and services in conjunction with that delineation. *Norman*, 429 F.3d at 1094–95. The court's statement thus was not addressing an illegal exaction of the sort Boeing alleges—which refers only to the amounts Boeing has already paid over to the government

based on the government's allegedly illegal application of FAR 30.606.  Boeing's claim falls under the *Eastport S.S.* category for which the "money-mandating" standard need not be met.[5]

We have, since *Norman*, assumed jurisdiction over statutory illegal exaction claims with no regard for whether the statutes were "money-mandating."  *See*, *e.g.*, *American Airlines, Inc. v. United States*, 551 F.3d 1294, 1296 (Fed. Cir. 2008); *Lummi Tribe v. United States*, 870 F.3d 1313, 1317–19 (Fed. Cir. 2017); *Virgin Islands Port Auth.*, 922 F.3d at 1333–34.  Thus, we will not interpret *Norman* as having erased the distinction between the two types of claims.  *See also National Veterans Legal Services Program v. United States*, Nos. 2019-1081, -1083, at 10–14 (Fed. Cir. Aug. 6, 2020).[6]

---

[5]     The *Norman* opinion cites *Cyprus Amax Coal Co. v. United States*, 205 F.3d 1369 (Fed. Cir. 2000), but that decision does not even use the phrase "illegal exaction," much less modify *Eastport S.S.*  In *Cyprus Amax* we held that the Export Clause of the Constitution authorized money damages for an illegal tax; the issue of recovery of an illegal exaction in the absence of such a money-mandating provision was not presented.  *Id.* at 1373–76.

[6]     The recent case of *Maine Community Health Options v. United States*, 140 S. Ct. 1308 (2020), did not involve a government exaction of money that the plaintiff was seeking to recover, but a claim for damages based on a violation of a statutory obligation to pay.  The Supreme Court did not discuss the "illegal exaction" branch of Tucker Act jurisdiction described in *Eastport S.S.* and *Testan*.  *See Maine Community*, 140 S. Ct. at 1327–31.

IV

For the foregoing reasons, we reverse the judgment of the Court of Federal Claims. We remand for proceedings consistent with this opinion.

Costs awarded to appellant.

**REVERSED AND REMANDED**