ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Assist Consultants Inc. ) | ASBCA Nos. 61525, 62090 |
| ) | |
| Under Contract No. W912ER-18-C-0009 ) | |

APPEARANCE FOR THE APPELLANT:   Douglas L. Patin, Esq.
  Bradley Arant Boult Cummings LLP
  Washington, DC

APPEARANCES FOR THE GOVERNMENT:   Michael P. Goodman, Esq.
  Engineer Chief Trial Attorney
  Rebecca L. Bockmann, Esq.
  Matthew Tilghman, Esq.
  Engineer Trial Attorneys
  U.S. Army Engineer District, Middle East
  Winchester, VA

OPINION BY ADMINISTRATIVE JUDGE D'ALESSANDRIS ON THE PARTIES'
CROSS-MOTIONS FOR SUMMARY JUDGMENT

In June 2017 the United States Army Corps of Engineers (government or USACE) awarded a contract to appellant, Assist Consultants, Inc. (ACI), for construction of the P-960 Triton Operational Facility at the Al Dhafra Air Base, United Arab Emirates (UAE). ACI attempted to satisfy the bonding requirements for the contract by submitting bonds issued by a corporate surety that was not listed on Treasury Department Circular 570, and the contracting officer rejected the bonds. The award of the contract was protested, and the government took corrective action.

The government resolicited the contract and, in December 2017, again awarded to ACI. The contract required ACI to submit performance and payment bonds within 15 days of award, and provided that failure to satisfy the bonding requirement would be a material breach of contract and would be cause for termination for default. ACI did not submit any bonds within the 15-day period, and later indicated that it would again submit bonds from a surety not on the Treasury Department list of approved sureties. ACI argued that, as an Afghan corporation, it was not practicable for it to obtain bonding from a Treasury Department approved surety due to limitations of Afghan law. The contracting officer indicated that he would not accept bonds from a surety not approved by the Treasury Department, and the parties entered into extended discussions of alternative methods of satisfying the bonding requirement. The government also issued a cure notice. While the parties were discussing the bonding requirements, the government

held the pre-construction conference. During the conference, a government employee stated that any workers with an Afghan passport would not be permitted entry onto the Al Dhafra Air Base. ACI requested a no-cost termination for convenience due to the fact that the government had not notified bidders of this restriction, and that, as an Afghan corporation, it would not have bid on the contract had this condition been disclosed. The government did not respond to ACI's request for a no-cost termination for convenience and subsequently terminated ACI for default. We find that the government has satisfied its initial burden of supporting the termination for default because ACI did not satisfy the contractual requirement for performance and payment bonds. However, we hold that there are material factual issues regarding ACI's defense of prior material breach regarding the government's purported failure to disclose its superior knowledge regarding an unwritten policy of prohibiting base access to Afghan passport holders. We deny both motions for summary judgment.

STATEMENT OF FACTS (SOF) FOR PURPOSES OF THE MOTION

In August 2016, the USACE posted Solicitation No. W912ER-16-R-0029 on FedBizOps (app. cross-mot. at Declaration of Ismail Amiri, dated June 29, 2019 (Amiri decl.) ¶ 5). In preparing ACI's Phase I Proposal, Mr. Amiri visited the UAE Command Military Works to obtain what he believes was the information required to submit and process security clearances for ACI's workers to have access to the Al Dhafra Air Base. ACI was advised by the officer handling inquiries that ACI should submit a copy of the signed contract once it was awarded and that would get things started. ACI was not advised of any restrictions that would prevent Afghanistan passport holders from entering the Al Dhafra Air Base. (Amiri decl. ¶ 6) The government asserts that the UAE Command Military Works was responsible for granting ACI permission to work on the base, but that ACI was required to separately obtain base passes for each worker from the Emirati Base Security Office (R4, tab 3 at 69-70; gov't opp'n to app. cross-mot. at Sworn Statement of Mark Stewart, dated September 5, 2019 (Stewart decl.) ¶ 6; Sworn Statement of Nic Sison, dated September 5, 2019 (Sison decl.) ¶ 14). The Solicitation had already advised that the process of obtaining those clearances would take at least six months to accomplish (Amiri decl. ¶ 6).

On September 26, 2016 ACI responded to Phase I of Solicitation No. W912ER-16-R-0029 (Amiri decl. ¶ 5). On February 17, 2017, one of the prospective bidders submitted an inquiry on ProjNet:

> Some of our contractor workforce with valid visas in the
> UAE are from islamic countries that have recently been

banned from the US[1] to include Syria and Iraq. We would like to understand the restriction about security and base access procedures on US side for our workforce.

(R4, tab 53 at 12127 (capitalization and punctuation as in original)) On February 22, 2017, Mark Stewart of the USACE responded:

The USACE RO is not aware of any restrictions placed on workers entering the USAF sections of the base. The primary issue is will the Al Dhafra AB Security Office allow workers from certain countries on base. the RO is aware of workers from Iran and Afghanistan not being allowed on base. All workers entering the USAF section of the base will have to go through biometric screening through DBIDS before they will be allowed to enter USAF sections.

(*Id.* at 12127-28 (capitalization and punctuation as in original))

As a part of the Phase II Proposal, ACI was required to submit a bid bond in the amount of $3 million. The government acknowledged receipt of ACI's bank cashier check in the amount of $3 million on March 1, 2017. (Amiri decl. ¶ 7)

On June 29, 2017, the government awarded Contract No. W912ER-17-C-0010 (-0010 contract), to Assist for the design and construction of the P-960 Triton Operational Facility at the Al Dhafra Air Base, UAE (R4 tab 19). That same day, and before the award was communicated to ACI, the USACE UAE in-country Area Engineer Mark Stewart emailed his boss Khaled Masoud, expressing his concerns that "there may be a big problem with [ACI] obtaining base passes. The [contractor] is located in Afghanistan and we have seen the Al Dhafra Security Office not allow anyone on base that has a passport from Afghanistan" (app. cross-mot. at ex. 2; ex. 3 (Stewart Deposition) at 25). Mr. Stewart later testified at deposition that he had been told by a project engineer, Jai Parksh, that anyone with an Afghan passport would not be granted base access (app. cross-mot. at ex. 3 at 25-26). In early July 2017, the government held internal discussions and concluded that base access would not be a problem for ACI, based on ACI's work plan. In August 2017, the USACE and Air Force held further discussions, without ACI present, and concluded that ACI had a presence in the UAE and that ACI had represented that they had subcontractors that had previously worked on the base and, therefore, there should not be a problem with base access. (Gov't opp'n at ex. 3 at 9982; Stewart decl. ¶ 19) Mr. Stewart

---

[1] Executive Order No. 13769, colloquially known as the "Muslim Ban" was issued on January 27, 2017, 3 weeks before the ProjNet question.

states that Mr. Amiri informed him that ACI "planned to use subcontractors who had worked at the base previously" and that it was "possible that those subcontractors could have had active base passes that could possibly be transferred to work under a different contractor" (Stewart decl. ¶ 18). Mr. Amiri denies that this conversation took place (Second Declaration of Ismail Amiri, dated October 16, 2019 (Second Amiri decl.) ¶ 5).

The -0010 contract included Federal Acquisition Regulation (FAR) 52.228-15, PERFORMANCE AND PAYMENT BONDS - CONSTRUCTION (OCT 2010) which provides in relevant part:

> (b) Amount of required bonds. Unless the resulting contract price is $150,000 or less, the successful offeror shall furnish performance and payment bonds to the Contracting Officer as follows:
>
>> (1) Performance bonds (Standard Form 25). The penal amount of performance bonds at the time of contract award shall be 30 percent of the original contract price.
>
>> (2) Payment Bonds (Standard Form 25-A). The penal amount of payment bonds at the time of contract award shall be 30 percent of the original contract price.
>
> . . .
>
> (d) Surety or other security for bonds. The bonds shall be in the form of firm commitment, supported by corporate sureties whose names appear on the list contained in Treasury Department Circular 570, individual sureties, or by other acceptable security such as postal money order, certified check, cashier's check, irrevocable letter of credit, or, in accordance with Treasury Department regulations, certain bonds or notes of the United States.

(R4, tab 19 at 57-58) The -0010 contract also provided at Section 00 73 10 - Supplemental Contract Requirements that, as a condition precedent to issuance of notice to proceed, ACI must provide to the Contracting Officer and Contract Specialist "original and fully executed Surety or other security for bonds in accordance with FAR Clause, 52.228-15, PERFORMANCE AND PAYMENT BONDS -- CONSTRUCTION." Section 00 73 10 further states: "FAILURE TO PROVIDE THE FOLLOWING ITEMS TO THE CONTRACTING OFFICER WITHIN FIFTEEN

4

(15) DAYS OF CONTRACT AWARD SHALL BE CONSIDERED A MATERIAL BREACH OF CONTRACT AND COULD CAUSE THIS CONTRACT TO BE TERMINATED FOR DEFAULT/CAUSE." (R4, tab 19 at 65)

Following award of the -0010 contract, ACI submitted to the contracting officer, Mr. Tino Philip, a performance bond and a payment bond for that contract, each executed by a representative of ION Insurance Company, Inc. (ION), a commercial surety bonding company (R4, tab 5). ION is not, and was not at any relevant time, a U.S. Treasury certified surety and does not appear in Treasury Department Circular 570. (*id.*; compl. ¶ 10; gov't mot., ex. 1). The bonds were submitted along with a letter dated July 18, 2017, from ION, stating "we would submit that it is impractical for [ACI] to obtain bonds for this contract from Treasury listed sureties" (R4, tab 5 at 1). On July 26, 2017, Mr. Philip rejected ACI's July 2017 request to use ION bonds to meet the requirements of the -0010 contract (R4, tab 43 at 1). Mr. Philip asserts that he rejected the bonds because they did not comply with that contract's bond requirements (Sworn Statement of Tino Philip, dated February 13, 2019 (Philip decl.) ¶ 7).

On July 31, 2017, the award of the -0010 contract was protested by an unsuccessful offeror (R4, tab 45 at 29). The government ultimately engaged in corrective action by terminating for convenience the -0010 contract, and requesting resubmission of proposals and re-evaluating all responsive proposals (R4, tab 37; compl. ¶ 7).

Following the bid protest and the government's corrective action, ACI resubmitted its proposal, with a date of November 22, 2017 (R4, tab 27). Upon re-evaluation, the government again awarded the P-960 project to ACI, on December 5, 2017 (R4, tab 3 at 2). The second award, via Contract No. W912ER-18-C-0009 (the contract), was in the amount of $19,685,752 for the design and construction of the P-960 Triton Operational Facility at the Al Dhafra Air Base, UAE (*id.* at 1-2).

The Contract required that ACI: (a) commence work under this contract within one (1) calendar day after the date the Contractor receives the notice to proceed; (b) prosecute the work diligently; and (c) complete the entire work ready for use not later than nine hundred twenty nine (929) calendar days from award. (R4, tab 3 at 25) The Solicitation No. W912ER-16-R-0029 was incorporated into the contract (*id*. at 17). The solicitation, incorporated into the contract, included FAR 52.228-1, BID GUARANTEE (SEP 1996), which states in part:

> (d) If the successful bidder, upon acceptance of its bid by the Government within the period specified for acceptance, fails to execute all contractual documents or furnish executed bond(s) within 10 days after receipt of the forms

by the bidder, the Contracting Officer may terminate the
contract for default.

(R4, tab 36 at 31)

The solicitation and the contract included FAR 52.228-15, PERFORMANCE AND PAYMENT BONDS - CONSTRUCTION (OCT 2010), the same clause which was contained in the -0010 contract. Pursuant to FAR 52.228-15, the penal sum of the performance bond was $5,905,725.60 (30 percent of the contract price) (R4, tab 3 at 51). Similarly, the penal sum of the payment bond was $5,905,725.60 (30 percent of the Contract price) (*id*.). The contract also contained Section 00 73 10 Supplemental Contract Requirements, as did contract -0010 (*id.* at 62-63).

The Contract specifications required ACI to complete the design in stages: 35% (preliminary design); 65% (design development); 100% (pre-final); and final (*id.* at 129-130). Upon submission of certified design documents for each stage, ACI was permitted to proceed with material and equipment purchases, fabrication, and construction of any elements covered by that design submittal (R4, tab 3 at 121). ACI was required to start construction once each design submittal was approved and the government issued clearance for construction (*id.* at 129).

ACI did not furnish the performance and payment surety bonds by December 20, 2017, 15 days after award, as required by Section 00 73 10 of the contract (compl.¶ 8; R4, tab 2 at 3). On January 3, 2018, ACI's representative Saed-Ismail Amiri stated, in a telephone conversation with Mr. Philip and government project manager, Peter DeMattei, that ACI planned to submit performance and payment bonds from ION (compl. ¶ 8; R4, tab 6). Mr. Philip informed ACI that its plan to submit ION bonds would not comply with the contract's performance and payment bond requirements (Philip decl. ¶ 13). Later that day, Mr. Amiri informed Mr. Philip via email that ACI would furnish an irrevocable letter of credit from its banking institution as required security, in order to meet the contract's bonding requirements (R4, tab 6). During these discussions, ACI consistently asserted that the ION bonds were permitted pursuant to FAR 28.201, and 28.202 (Amiri decl. ¶ 23).

On January 12, 2018, ACI proposed five different options to satisfy the bonding requirements (R4, tab 7). Specifically, ACI proposed to (1) furnish performance and payment bonds from ION in the penal sum amounts set forth in the contract; (2) furnish performance and payment bonds from ION in the penal sum of 50% of the contract value for both the performance and payment bonds; (3) furnish ION bonds in the penal sum amount of 30% along with the remittance of $3 million in United States bonds (per FAR 28.204-1); (4) furnish ION bonds in the penal sum amount of 30%, along with the remittance of $3 million in United States bonds, with the government retaining 10% from progress payments; or (5) remit $3 million in United States bonds and

6

negotiate with the government regarding an amount of retainage to apply to progress payments (*id.*). Mr. Philip, the contracting officer, rejected ACI's proposed actions based upon his determination that the proposed options would not meet the "requirements of the contract" (Philip decl. ¶ 14).

The government issued a cure notice on January 12, 2018, addressing ACI's failure to furnish the contractually-required bonds (R4, tab 8). In the cure notice, Mr. Philip notified ACI that "the Government consider[ed ACI's] failure to provide original and fully executed surety bonds or other security for the performance and payment bonds requirement . . . a condition that is endangering performance of the Contract" (*id.* at 1). The cure notice further provided that the government may terminate ACI for default under FAR 52.249-10, Default (Fixed-Price Construction), unless this condition was cured within 10 days (*id.*). ACI responded to the government's cure notice by letter dated January 16, 2018 (R4, tab 9). ACI did not dispute that it failed to meet the contract's performance and payment bond requirements, and as its response to the cure notice and to "avoid termination for default," stated it would furnish "alternative security" in the form of a cashier's check for $3 million and $8,811,451.20 in U.S. bonds (to fulfill the 30 percent penal sum for performance bonds, and the 30 percent penal sum for payment bonds, in accordance with the contract requirements) (R4, tab 9 at 1). As part of this proposal, ACI directed Mr. Philip to "retain [ACI's $3 million check that it had furnished as a bid guarantee along with its proposal] and apply it to ACI's obligation to furnish" compliant bonds (*id.*). However, ACI noted that it believed that the ION bonds were contractually permitted, and that it was only proposing to take this action due to the threat of default (*id.* at 2).

The following day, January 17, 2018, ACI's representative Ahmad Faisal Raoufy informed Mr. Philip via telephone that while awaiting the U.S. Bonds, ACI would initiate a wire transfer, which, along with the $3 million cashier's check, would cover the penal sum of the performance and payment bonds to fulfill the bond requirements (R4, tab 28 at 1). ACI's representative further stated that he would provide the government a confirmation of this transaction the following day (R4, tab 12 at 1-2). In an email on January 18, 2018, Mr. Philip asked ACI to confirm that it wanted the government to retain the $3 million check that was submitted as a bid guarantee as part of the penal sum of the performance bond (Amiri decl. ¶ 25). ACI did not confirm that direction (*id.*). In a follow-up letter sent January 18, 2018, Mr. Philip notified ACI that "[t]he Government will not issue notice to proceed until ACI has complied with the ... bond requirement[s]" (R4, tab 28 at 1).

On January 17, 2018, the USACE Finance Center provided the bank routing information for Mr. Raoufy's anticipated wire transfer (R4, tab 48 at 2-3). Mr. DeMattei provided this bank routing information to Mr. Amiri that same day (R4, tab 46). On January 18, 2018, the USACE sent ACI's $3 million cashier's check to the USACE Finance Center (Philip decl. ¶ 17). On January 20, 2018, the government requested

written confirmation from ACI that (1) ACI will be able to comply with the contract's bond requirements; and (2) after ACI complies with the bond requirements, it will be able to complete all of the work required for this project (R4, tab 10 at 2). There is no response to the government's request in the record.

While the parties were discussing the bonding requirements, the parties held the pre-construction meeting. The contract required that ACI hold its pre-construction meeting any time prior to mobilization and before construction work began (R4, tab 3 at 90). The pre-construction meeting was held on or about January 20, 2018,[2] in Abu Dhabi, UAE (R4, tab 29). At the pre-construction conference, the USACE Resident Engineer for the UAE read the following statement from his agenda document:

> The Prime Contractor, ACI and ALL of their Sub-Contractors shall obtain Certification to work on a Military Base in the UAE. The application for this can be filled out and submitted online through Command Military Works (CMW). This process if not followed up on almost a daily basis could take as long as 3-6 months. Anyone that submits an Afghanistan Passport will NOT be allowed entry to Al Dhafra AB.

(App. cross-mot. at ex. 5 (Stewart depo. at 55); ex. 6 (Philip depo. at 40); ex. 7 at 11; *see also* Amiri decl. ¶ 29) Mr. Stewart, explained at the meeting that the UAE government has an ongoing but unwritten policy of refusing to allow Afghan Nationals access to the base. This restriction is not from the US side or US base but the restriction is from the Emiratis who control the main entrance (Amiri decl. ¶ 30). Mr. Stewart further testified at deposition that the policy was unwritten, and that:

> if you go and ask Emiratis for a letter that says you will not allow these people on base because they're from Afghanistan, they will feel insulted. They will not give you a letter or a document that states that. It's the way they do it. I mean, they just don't put things down in writing if they can help it.

(App. cross-mot. at ex. 9 (Stewart depo.) at 67)) Mr. Stewart further testified that he:

> went to the Air Force to talk with them and that's when they produced the memo that's part of one of the exhibits – Tino's letter, that lists several different companies and it

---

[2] Documents in the record conflict as to whether the meeting was held on January 20, 2018 or January 21, 2018, and the exact date is immaterial to this decision.

says they would have to undergo stringent security checks, and if they didn't agree to it, they would not be allowed on base.

(App. cross-mot. at ex. 10 (Stewart depo.) at 70-71)  The government attempts to walk-back this statement by asserting that the Emirati security office policies were unpredictable (Sison decl. ¶¶ 10-12).  The parties dispute an additional statement made during the pre-construction conference.  Mr. Amiri states that, during the meeting, the USACE construction representative Nic Sison told ACI that he would call a UAE official, Captain Ali, to inquire about the restriction and later during the meeting reported back that Captain Ali had confirmed that Afghans are not allowed entry onto the Al Dhafra Airbase (Amiri decl. ¶ 31; R4, tab 15 at 1-2).  Mr. Sison states that he did not offer to contact Captain Ali, and simply stated that ACI would need to contact the Emirati Security Office (Sison decl. ¶ 13).

By email dated January 22, 2018, Mr. Amiri wrote to the contracting officer, stating that, if the USACE had disclosed this policy in the solicitation, ACI would not have submitted a proposal for the contract, and that if the USACE had disclosed this policy after ACI submitted its proposal and prior to award (either original or post-protest), ACI would have withdrawn its proposal.  ACI offered to accept a no-cost termination of the contract for the convenience of the government.  The contracting officer never responded to this request in writing.  (Amiri decl. ¶ 32; Amiri decl. at ex. 21)  By letter of the same date, ACI, through counsel, also stated, that because "its firm is not going to be allowed access to the construction site due to UAE prohibitions against Afghan nationals on the base," that there was "no point in posting a performance bond" (R4, tab 11 at 1).  ACI additionally suggested that Mr. Philip should accept bonds supported by ION, because the USACE previously accepted performance and payment bonds underwritten by a different non-Treasury listed surety on one of ACI's 30 government contracts or task orders (R4, tab 11 at l; gov't mot. at ex. 2 (Philip decl.) ¶ 7).  ACI later cited to a USACE contract in Romania where the government accepted performance and payment bonds issued by ION (Amiri decl. ¶ 12).

Also relevant is a dispute between the parties regarding ACI's labor staffing plans.  In its proposal, ACI stated that it would staff the project with engineers and supervisors working out of its Abu Dhabi, UAE office and that its project team "will be highly professional personnel from USA, UK, and Turkey" (R4, tab 23 at 20).  ACI additionally represented that it previously had performed work at the Al Dhafra Air Base (R4, tab 25 at 60).  Additionally, ACI's proposal indicated that it would "utilize small local subcontractors and labor providers in UAE" (R4, tab 23 at 10) and that it planned to use UAE subcontractors with existing base access (R4, tab 27 at 54).  However, at the pre-construction conference, Mr. Stewart told Mr. Amiri that it might be possible to get a few key Afghan employees base access but Mr. Amiri told Mr. Stewart that ACI planned to use roughly 100 Afghan nationals to perform the contract (app. resp. to gov't

9

opp'n at ex. 4 (Stewart depo.) at 65). Mr. Stewart told Mr. Amiri that ACI was "gonna have a problem . . . 'cause I'm pretty sure [the UAE security are] not gonna let that many people with that – from Afghanistan on a UAE military base" (*id.*). Additionally, Mr. Amiri's January 22, 2018 email states that ACI "is an Afghan company that utilizes Afghan workers" and that its "core staff of more than 60 engineers and supervisors are Afghan Nationals and are used to perform our work" (Amiri decl. at ex. 21).

On January 25, 2018, Mr. Philip responded to ACI's January 22, 2018 letter, stating that "USACE ha[s] received no confirmation that the UAE government ha[s] any such policy in place" prohibiting Afghan nationals (R4, tab 13 at 1). Mr. Philip attached to his letter a memorandum from the Department of the Air Force, Headquarters - 380th Air Expeditionary Wing at Al Dhafra Air Base, which stated that a native or passport holder of a specific country listed in the memorandum, would be prohibited access to the base if those persons did not either consent to additional screening, or obtain written approval of the installation commander (*id.* at 1, 4-5). However, this document appears to address access to the United States portion of the base, and not the UAE base access that is required for an individual to reach the US portion of the base.

In a separate letter, also dated January 25, 2018, Mr. Philip issued a show cause notice, providing ACI 10 days, until February 4, 2018, to show cause as to why its failure to perform arose from causes beyond its control and without fault or negligence on its part (R4, tab 12). Mr. Philip informed ACI that he considered ACI's silence as to whether it would meet the contract's bond requirements an affirmation of ACI's inability or unwillingness to comply with those requirements (*id.* at 2).

Six days after the issuance of the Government's show cause notice, ACI's Office Engineer, Naeem Alokozay sent Mr. Philip an email stating that ACI "takes your show cause letter . . . seriously" and that ACI was "working to cure the defects" referenced in the show cause notice (R4, tab 14 at 2-3). Mr. Alokozay also stated that ACI was working with a "finance broker" and was "working diligently to satisfy" the contract's performance and payment bond requirements (*id.* at 2). Mr. Alokozay requested 10 additional days (until February 14) by which to respond to the show cause notice and further stated that ACI's design team was "proceeding [on] the job [and] developing the master plan and site layout" (*id.* at 3).

On January 31, 2018, Mr. Philip responded by email to Mr. Alokozay's message, seeking more information before he extended the show cause response deadline (R4, tab 14 at 1-2). With regard to the design work Mr. Alokozay represented ACI was undertaking, Mr. Philip stated that "your firm is engaging in this work at its own risk, and ACI has been notified via the January 25, 2018 show cause letter that the government is seriously considering termination. I would consider these facts before incurring any additional costs on this project" (*id.* at 2). On that same date, Mr. Raoufy

responded to Mr. Philip's email and instructed Mr. Philip to "disregard" Mr. Alokozay's email, as Mr. Alokozay "was not authorized to send it and does not speak for Assist Consultants, Inc." (*id.* at 1). On February 1, 2018, Mr. Philip asked for clarification on this retraction, to which Mr. Amiri responded "the email from Mr. Raoufy speaks for itself; Mr. Alokozay was not authorized to communicate with [the contracting officer], please ignore his email" (R4, tab 50 at 2). Mr. Philip responded to Mr. Amiri with an email dated February 1, 2018, which stated:

> It was my understanding from our conversation on January 17, and subsequent conversations at the pre-construction meeting that ACI would provide some other acceptable security ... [c]an you please confirm whether ACI intends to meet the bonding requirement stated in the Contract? It is rather concerning that I have asked you on several occasions to confirm this, and you have not provided any response . . . .

(R4, tab 50 at 1)

On February 4, 2018, Mr. Raoufy responded to the government's show cause notice (R4, tab 15). In this response, Mr. Raoufy stated that ACI had already provided performance and payment bonds that met the contract requirements, demonstrating its "ability and willingness to comply with the Contract's bonding requirements" (*id.* at 1). The government interprets this as a reference to the ION bonds that ACI had submitted for the -0010 contract (gov't mot. at 12) while ACI asserts it obtained ION bonds for the re-awarded contract, but did not submit the bonds to the contracting officer (Amiri decl. ¶ 21, *see also* ex. 26). In addition, Mr. Raoufy indicated ACI had "entered into discussions with a U.S. broker to obtain Treasury Department Circular 570 bonding" (R4, tab 15 at 2). Mr. Raoufy's message attached a letter dated February 1, 2018 from Michael Youngblut, Vice President, National Surety Practice, for M&T Insurance Agency (R4, tab 15 at 3). Mr. Raoufy also requested that the government "suspend a response" to the show cause notice for 25 days, because "the process itself requires an extensive amount of documentation and examination, especially given that it appears that no Treasury Department Circular 570-listed surety has ever issued performance and payment bonds to an Afghan company" at which time ACI would provide an update on its "ability to substitute bonding from a Treasury Department Circular 570-listed surety for the bonds" (R4, tab 15 at 2).

On February 6, 2018, Mr. Philip responded to ACI's February 4, 2018 letter, providing ACI until February 12, 2018 to provide any additional information to supplement its February 4 response to the show cause notice (R4, tab 16 at 2). The February 6 letter reminded ACI of the options provided in the contract for meeting the bonding requirements, and stated that if ACI required additional time to meet the bonding requirements by obtaining bonds supported by a Treasury Department

11

Circular 570 surety, ACI was required to meet the bonding requirements in the meantime with some other form of acceptable security listed in FAR 52.228-15. (*Id.*) The letter concluded:

> You are reminded that since ACI has not received notice to proceed, any work ACI undertakes is at ACI's own risk. It is suggested that ACI conside[r] this fact, as well as the fact that the Government has notified ACI that it is considering terminating ACI for default, prior to incurring any costs on this project.

(*Id.* at 3-4)

On the February 12, 2018 deadline for supplementing its show cause response, Mr. Raoufy submitted a letter indicating that "it is impracticable to obtain 570-listed surety" due to Afghan law, and as evidence of such, attached a screenshot of a February 8, 2018 email from Mr. Youngblut, indicating that a Treasury Department Circular 570 surety, Euler Hermes, would seek a 100% letter of credit security/collateral from a "US and/or European bank" to consider the bonding process, along with responses for three other Treasury Department Circular 570 sureties (R4, tab 17 at 1, 3).

Mr. Raoufy's February 12 letter indicated that after receiving Mr. Youngblut's February 8, 2018 email, ACI requested that Mr. Youngblut contact a "special" surety, Lexon (*id.* at 1). Mr. Raoufy stated that ACI was "cautiously optimistic about successfully completing [the underwriting] process" and that its "best estimate is that it will take 15-20 days to complete this process" (*id.*). Later on February 12, 2018, ACI sent Mr. Philip a letter on Lexon Surety Group letterhead, signed by Michael Youngblut, Vice President, National Surety Practice, for Lexon Surety Group, the same title as previously listed as his position for M&T Insurance Agency (R4, tab 18). In this letter, Mr. Youngblut stated "[w]e have started the full underwriting process ... [and] should have the process completed and be in a position to provide ACI with the necessary Performance and Payment bonds for this project in 7-10 business days." (*Id.*)

On February 12, 2018, Mr. Philip terminated ACI's right to proceed with work under the contract pursuant to FAR 52.249-10 (R4, tab 2). Mr. Philip determined that ACI had not shown that it was impracticable for it to obtain bonds supported by a surety listed in the Treasury Department Circular 570 (R4, tab 33 at 3, 5, tab 34). Mr. Philip additionally determined that a change to the contract to permit bonds not issued by Treasury Department Circular-570 sureties would have to have been done pre-award because it would have "altered the field of competition" and thus, would have been unfair to other offerors (R4, tab 33 at 3).

12

## DECISION

### I. Standard Of Review

We will grant summary judgment only if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A material fact is one that may affect the outcome of the decision. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The moving party bears the burden of establishing the absence of any genuine issue of material fact, and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987). Once the moving party has met its burden of establishing the absence of disputed material facts, then the non-moving party must set forth specific facts, not conclusory statements or bare assertions, to defeat the motion. *Pure Gold, Inc. v. Syntex (U.S.A.), Inc.*, 739 F.2d 624, 626-27 (Fed. Cir. 1984). "A genuine issue of material fact arises when the nonmovant presents sufficient evidence upon which a reasonable fact finder, drawing the requisite inferences and applying the applicable evidentiary standard, could decide the issue in favor of the nonmovant." *C. Sanchez and Son, Inc. v. United States*, 6 F.3d 1539, 1541 (Fed. Cir. 1993).

### II. Termination For Default

The government moves for summary judgment that ACI did not comply with the bonding requirements of the contract and, thus, that the government properly terminated ACI for default. ACI cross-moves for summary judgment that the government committed a prior material breach, excusing ACI's failure to perform, and that it did not breach the contract because it offered bonds that the contracting officer improperly failed to accept.

Termination for default is a "drastic sanction ...which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431 (Ct. Cl. 1969). When a contractor appeals a termination for default to the Board, the government bears the initial burden of justifying the termination. If the government demonstrates the propriety of the termination, the burden shifts to the contractor to demonstrate that its default was excusable, either because the government committed a prior material breach that discharged appellant's duty to perform; the breach was beyond the appellant's control and not due to the appellant's fault or negligence; or because the contracting officer's default decision was arbitrary or capricious. *Highland Al Hujaz Co.*, ASBCA No. 58243, 16-1 BCA ¶ 36,336 at 177,164 (internal citations omitted). Accordingly, we first review the government's decision to terminate ACI for default. As we find that the termination for default was justified we next look to ACI's argument that the government committed a prior material breach. Because

13

we find that there are material factual issues in dispute regarding ACI's allegations of prior material breach, we deny both motions.

### A. Termination For Failure To Satisfy the Bonding Requirement

The facts regarding the contracting officer's termination of ACI for default generally are not in dispute. After ACI submitted its bid on the -0010 contract, it attempted to satisfy the bonding requirement with bonds issued by ION (R4, tab 5). The contracting officer indicated that the bonds were not acceptable because they were not issued by a surety listed on Treasury Department Circular 570 (R4, tab 43 at 1; Philip decl. ¶ 7). After the -0010 contract was terminated for convenience due to a bid protest, ACI resubmitted its bid, with knowledge that the contracting officer did not intend to accept non-conforming bonds, and indicated that it intended to satisfy the bonding requirements with non-conforming bonds. The contracting officer informed ACI of the contractually-permissible means of satisfying the bonding requirement and provided ACI with multiple opportunities to meet the contractual requirements (Philip decl. ¶ 13; R4, tabs 7-8, 10, 12, 14, 16, 50). ACI failed to do so, and the contracting officer properly terminated ACI for default (subject to ACI's argument, discussed below that the government committed a prior material breach).

As always, we start with the terms of the contract. The contract contained FAR 52.228-15, PERFORMANCE AND PAYMENT BONDS - CONSTRUCTION (OCT 2010) which provides in relevant part that the contractor was required to submit performance and payment bonds in the amount of 30% of the contract price, and that:

> (d) Surety or other security for bonds. The bonds shall be in the form of firm commitment, supported by corporate sureties whose names appear on the list contained in Treasury Department Circular 570, individual sureties, or by other acceptable security such as postal money order, certified check, cashier's check, irrevocable letter of credit, or, in accordance with Treasury Department regulations, certain bonds or notes of the United States.

(R4, tab 3 at 51) In addition, the contract contained Section 00 73 10, Supplemental Contract Requirements, providing that, as a condition precedent to issuance of notice to proceed, ACI must provide to the Contracting Officer and Contract Specialist "original and fully executed Surety or other security for bonds in accordance with FAR 52.228-15, PERFORMANCE AND PAYMENT BONDS CONSTRUCTION." Section 00 73 10 further states: "FAILURE TO PROVIDE THE FOLLOWING ITEMS TO THE CONTRACTING OFFICER WITHIN FIFTEEN (15) DAYS OF CONTRACT AWARD SHALL BE CONSIDERED A MATERIAL BREACH OF

CONTRACT AND COULD CAUSE THIS CONTRACT TO BE TERMINATED FOR DEFAULT/CAUSE." (R4, tab 3 at 62)

As detailed in the facts above, ACI did not submit bonds compliant with FAR 52.228-15, or the alternatives contained in that FAR section, such as a certified check, cashier's check, irrevocable letter of credit, or, bonds or notes of the United States. Failure to satisfy the bonding requirement is a valid basis for the government to terminate a contract for default. *See, e.g., Aetna Cas. & Sur. Co. v. United States*, 208 Ct. Cl. 515, 519 (1975); *Ruffin's A-1 Contracting*, ASBCA No. 38343, 90-3 BCA ¶ 23,243 at 116,626. ACI does not allege that it submitted bonds that complied with FAR- 52.228-15. Instead, ACI asserts that the contracting officer misinterpreted the requirements of the contract, and should have accepted bonds issued by a surety not listed on Treasury Department Circular 570, such as the ION bonds that ACI attempted to submit for the -0010 contract and states that it procured for this contract (app. cross-mot. at 22-29). ACI additionally argues that the government improperly found that ACI failed to provide adequate assurances that it would comply with the bonding requirements (app. cross-mot. at 29-30), and that the government failed to prove that ACI was endangering performance of the contract (*id.* at 31-32). As discussed below, we reject these arguments and hold that the government had a valid basis for terminating ACI for default (subject to ACI's prior breach defense discussed later in this decision).

ACI's main argument is that the contracting officer erred in requiring that the performance and payment bonds be issued by "corporate sureties whose names appear on the list contained in Treasury Department Circular 570" (FAR 52.228-15(d)) because another FAR provision, 28.202 provides that "[f]or contracts performed in a foreign country, sureties not appearing on Treasury Department Circular 570 are acceptable if the contracting officer determines that it is impracticable for the contractor to use Treasury listed sureties" (FAR 28.202(b)). Unfortunately for ACI, FAR 28.202, is not incorporated into the contract. Nevertheless, ACI contends that the contract should be interpreted as containing FAR 28.202, because another FAR provision, FAR 28.201, provides that "[s]olicitations shall not preclude offerors from using the types of surety or other security permitted by this subpart, unless prohibited by law or regulation" and that FAR 28.201 simply refers to "corporate or individual sureties" without specifying that the sureties be listed on Treasury Department Circular 570 (app. cross-mot. at 24-26).

We reject ACI's interpretation of the contract based on FAR 28.202(b) for several reasons. First, as mentioned above, the FAR provision is not included in ACI's contract. Second, to the extent that FAR 28.201, could be interpreted as requiring the contracting officer to accept bonds issued by sureties not listed on Circular 570, ACI waived this argument by not raising it prior to award of the contract. This is especially true here, where ACI was aware based on the -0010 contract that the

15

contracting officer intended to enforce the provision of FAR 52-228-15 that the bonds be issued by a Treasury Department Circular 570 surety. In *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007) the Federal Circuit held that a party that had an opportunity to object to a patent error in the terms of a solicitation, but did not do so prior to award, had waived its right to raise the same objection in a bid protest before the Court of Federal Claims. The Federal Circuit has more generally held that this waiver principle "applies to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." *COMINT Systems Corp. v. United States*, 700 F.3d 1377, 1382 (Fed. Cir. 2012); *Inserso Corp. v. United States*, 961 F.3d 1343, 1349 (Fed. Cir. 2020). Similarly, the Board has recognized this waiver principle. *Walsh Constr. Co.*, ASBCA No. 52952, 02-2 BCA ¶ 32,024 at 158,279-80, *aff'd Walsh Contr. Co. v. Brownlee*, 80 Fed. Appx. 679 (Fed. Cir. 2003). Moreover, the Federal Circuit's recent limitation of the waiver doctrine is not applicable here. In *Boeing Co. v. United States*, 968 F.3d 1371, 1377-78 (Fed. Cir. 2020), the Federal Circuit limited the application of the waiver principle where it would be futile for the contractor to object pre-award. In that case, Boeing challenged the lawfulness of a mandatory FAR provision, FAR 30.606. In short, the court reasoned that Boeing could not have waived its right to challenge the FAR provision since the agency did not have discretion to waive a mandatory FAR provision. *Boeing*, 968 F.3d at 1377. However, here, FAR 28.202(b) would allow the contracting officer to allow bonds from sureties not listed on Circular 570 upon a finding by the contracting officer that it was "impracticable" for the contractor to obtain bonds from a Treasury Department listed surety (FAR 28.202(b)). Thus, to the extent that FAR 28.201, required the government to consider non-Treasury listed sureties, ACI has waived that argument.

Third, even if ACI is correct that FAR 28.202(b) should be interpreted as part of the contract, that provision only applies if the contracting officer determines that it is "impracticable" for the contractor to obtain Treasury approved bonds. However, here, the contracting officer did not make such a determination. In fact, the contracting officer declined to consider non-Treasury listed bonds because such a change would have altered the competitive structure of the solicitation and would not be fair to other bidders (R4 tab 33 at 3). Fourth, to the extent FAR 28.201 or FAR 28.202 are contained in the contract, which they are not, they do not create an enforceable right for ACI because the provisions are not for the benefit of the contractor. Instead, the relevant FAR provisions are for the protection of the government. *Allen Engineering Contractor, Inc. v. United States*, 115 Fed. Cl. 457, 463 (2014); 40 U.S.C. § 3131(b)(1) (providing that performance bond is provided by the contractor "for the protection of the Government"). Finally, to the extent ACI argues that its interpretation of the FAR 28.201 and 28.202 must be correct because another USACE contracting officer accepted ION bonds on a single contract in Romania (app. resp. to gov't opp'n at 19), the Board performs a de novo review and grants no weight to a contracting officer's

16

legal conclusions, especially the conclusions of a contracting officer on another contract.

ACI additionally asserts that FAR 28.202(b) requires a determination of impracticability based upon the circumstances of ACI, as the awardee. The FAR provision provides that non-Circular 570 sureties are permissible for contracts performed in foreign countries "if the contracting officer determines that it is impracticable for the contractor to use Treasury listed sureties." FAR 28.202(b). Thus, according to ACI, as an Afghan company, the determination should be based on the practicality of an Afghan contractor obtaining bonds supported by a Circular 570 surety (app. resp. to gov't opp'n at 21). The government, instead, asserts that the determination should be based upon the location of the project, and that a contractor performing a contact in the UAE can obtain bonds supported by a Circular 570 surety (gov't opp'n to app. cross-mot. at 54). As noted above, we hold that the determination of whether to accept non-Circular 570 bonds is a determination to be made prior to award. To the extent FAR 28.202(b) could be read as requiring a determination based on the awardee, this would create a nonsensical result as it would require the government to accept non-Circular 570 bonds for projects in places like Canada or Europe if it awarded a contract to a contractor based in a country where it is "impracticable" to obtain bonding from Circular 570 sureties.

In addition, we reject ACI's course of dealing argument. ACI asserts that there was a course of dealing between ACI and the government whereby the government would accept bonds issued by sureties not listed on the Treasury Department Circular 570 (app. cross-mot. at 26). To establish a course of dealing, the contractor must demonstrate "actual knowledge by both parties of consistent conduct by one party in its contractual dealings with the other *over an extended period of time* regarding a particular contract provision upon which the other is reasonably entitled to rely." *ECC International*, *LLC*, ASBCA No. 60484, 18-1 BCA ¶ 37,203 at 181,114 (emphasis in original) (quoting, *Comptech Corp.*, ASBCA No. 55526, 08-2 BCA ¶ 33,982 at 168,086). Here, ACI asserts that in one of its 30 contracts awarded by the USACE over the past five years, a contracting officer accepted non-conforming bonds (R4, tab 11 at 1), and that the government accepted ION bonds on one project in Romania (Amiri decl. ¶ 12). Even under the summary judgment standard, and granting all inferences to ACI, this is not sufficient to establish a course of dealings. This is especially true here, where ACI was on notice from the award of the -0010 contract that this contracting officer would reject non-conforming bonds and would not waive the requirement (R4, tab 43).

ACI also disputes the government's finding that ACI failed to provide adequate assurances that it would comply with the bonding requirements (app. cross-mot. at 29-30). However, it is clear from the record that ACI did not proffer compliant bonds by the deadline in the cure notice, and had not followed-through on several promises to deliver bonds. (R4, tab 2) ACI also alleges that the government failed to prove that ACI was

endangering performance of the contract (app. cross-mot. at 31-32). However, the plain terms of the contract provide that failure to timely satisfy the bonding requirements would constitute a material breach of the contract. ACI could not get a notice to proceed until satisfying the bonding requirement, and thus was already behind schedule and endangering performance of the contract (R4, tab 3 at 62, tab 16 at 3-4). A lack of bonds constitutes a failure to prosecute work on a project. *Allen Eng.*, 115 Fed. Cl. at 467. Accordingly, we hold that the government has established a valid basis for its termination of ACI's contract for default, subject to ACI's defense of prior material breach. We address that argument next.

ACI raises a new argument in its reply brief, that the government improperly denied ACI's request to withdraw its bid due to a bid mistake (app. resp. to gov't opp'n at 10-11). However, Mr. Amiri's request for a no-cost termination for convenience fails to establish the existence of a bid mistake because Mr. Amiri's request in no way alleges a bid mistake (Amiri decl. ex. 21).

### B. ACI's Defense of Prior Material Breach

ACI asserts that its failure to obtain performance and payment bonds was excused due to the government's prior material breach of the contract by failing to disclose its superior knowledge that materially affected ACI's ability to perform the contract (app. cross-mot. at 1). According to ACI, the USACE knew that the UAE Command Military Works had an unwritten policy of excluding Afghan nationals from the Al Dhafra Air Base, but failed to share this information with offerors. The government disputes that it possessed superior knowledge, and asserts that, even if knowledge of the purported unwritten policy were material, ACI continued to perform, and thus, cannot support a claim for prior material breach (gov't opp'n to app. cross-mot. at 40).

The doctrine of superior knowledge generally applies when:

> (1) a contractor undertakes to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*Hercules, Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994) (quoting *American Ship Bldg. Co. v. United States*, 654 F.2d 75, 79 (Ct. Cl. 1981)).

ACI asserts that it satisfied the first prong of the test because it was unaware of the purported unwritten policy of denying Afghan citizens access to the base (app.

18

cross-mot. at 20). ACI's position is supported by Mr. Amiri's declaration that he was unaware of the UAE policy, and the government's statement at the pre-construction conference that there was an unwritten policy of excluding Afghan nationals from the base (Amiri decl. ¶ 29; app. cross-mot. at ex. 7 at 11). Additionally, ACI supports its position by citing the deposition testimony of government employees that they were aware of this unwritten policy prior to award of the contract (app. cross-mot. at ex. 5 (Stewart depo.) at 55; ex. 6 (Philip depo.) at 40) and an internal government e-mail following award of the -0010 contract, noting that there might be a problem in that the contract was awarded to an Afghan corporation and the UAE has excluded Afghan nationals from base access (app. cross-mot. ex. 2; ex. 3 (Stewart Deposition) at 25).

The government contends that ACI has not established entitlement pursuant to the first prong of the superior knowledge test because the Emirati Security Office, and not the UAE Command Military Works, is the "ultimate authority" for approving or denying base access. Thus, according to the government, even if UAE Command Military Works excluded Afghan nationals, they could be permitted base access by the Emirati Security Office (gov't opp'n to app. cross-mot. at 34-35). Additionally, the government relies on the ProjNet response to a question regarding the so-called "Muslim Ban" providing that "the RO is aware of workers from Iran and Afghanistan not being allowed on base" (R4, tab 53 at 12128), as providing notice to ACI of base restrictions. The government additionally contends that ACI did not demonstrate that knowledge of base access restrictions for Afghan workers was "vital" to its performance because ACI did not demonstrate that it was unable to get its workers onto the base (gov't opp'n to app. cross-mot. at 35-36).

While the ProjNet response that the government is "aware of workers from Iran and Afghanistan not being allowed on base" (R4, tab 53 at 12128) is less specific than the announcement at the pre-construction conference that "[a]nyone that submits an Afghanistan Passport will NOT be allowed entry to Al Dhafra AB" (app. cross-mot. at ex. 7 at 11) we find that this constitutes a material factual dispute. Additionally, the government's argument that ACI did not demonstrate that it was unable to get its workers on the base is itself a material factual dispute when balanced against the government's own statement that workers with Afghan passports "will NOT be allowed entry."

With regard to the second prong of the test, that the government was aware that the contractor had no knowledge and no reason to obtain the information, ACI again points to the internal government e-mail from Mr. Stewart, following award of the -0010 contract noting that "there may be a big problem with [ACI] obtaining base passes. The [contractor] is located in Afghanistan and we have seen the Al Dhafra Security Office not allow anyone on base that has a passport from Afghanistan" (app. cross-mot. at ex. 2).

19

The government contends that there was no reason for it to know that ACI was unaware of the unwritten policy because ACI's proposal addressed its plan to perform using workers from the United States, United Kingdom, and Turkey, who would be able to access the base (R4, tab 23 at 20-21) and because ACI's proposal states that it had done work at the Al Dhafra Air Base (R4, tab 25 at 60). Once again, we find that there are material factual disputes that prevent the entry of summary judgment for either party.

Regarding the third prong of the test, that any contract specification supplied mislead the contractor and did not put it on notice to inquire, ACI contends that it did inquire at the base, in accordance with the contractual terms, but was not informed about the unwritten policy of excluding Afghan citizens. (Second Amiri decl. ¶ 6)

The government contends that the ProjNet response put ACI on notice that Afghan workers may not be permitted base access. In addition, according to the government, the contract placed an affirmative duty on ACI to investigate, understand and comply with the base access requirements. The government additionally contends that ACI failed to properly investigate the base access requirements (gov't opp'n to app. cross-mot. at 37-38). Again, we find that resolution of this issue would require that we weigh the evidence, something that would require an evidentiary hearing to resolve.

Finally, ACI contends that it satisfied the fourth factor, that the government failed to provide relevant information, by citing to the statement at the pre-construction meeting that "[a]nyone that submits an Afghanistan Passport will NOT be allowed entry to Al Dhafra AB" (Amiri Decl. ¶ 29; app. cross-mot. at ex. 5 (Stewart depo.) at 55; ex. 6 (Philip depo.) at 40; ex. 7 at 11).

The government again cites to the ProjNet statement as evidence that the government did provide the relevant information to ACI and speculates that if ACI had made a proper inquiry at the Emirati Security Office that it would have been told which workers would be restricted (gov't opp'n to app. cross-mot. at 39). Once again, we find that the differences between the ProjNet disclosure and the statement provided to ACI at the pre-construction conference create a material factual issue preventing the entry of summary judgment for either side. As we are not permitted to weigh evidence in deciding motions for summary judgment (*Chugach Federal Solutions, Inc.*, ASBCA No. 61320, 20-1 BCA ¶ 37,617 at 182,594) we must deny both motions.

The government raises an additional argument that it contends would prevent entry of judgment in favor of ACI. According to the government, ACI waived its prior material breach claim. If ACI, in fact, waived its superior knowledge claim, the government would be entitled to entry of summary judgment, because we previously held that the government's termination for default was justified. According to the government, ACI never reserved its rights to end the agreement and elected to continue

with performance of the contract (gov't opp'n to app. cross-mot at 40).  The government relies upon *Precision Pine & Timber, Inc. v. United States*, 62 Fed. Cl. 635, 650 (2004) (citing *Northern Helex Co. v. United States*, 455 F.2d 546, 551 (Ct. Cl. 1972)) for the proposition that "[o]ne side cannot continue performance after a material breach by the other, act as if the contract remains fully in force, and then only raise the defense of prior material breach when it has been terminated for its own default" (gov't opp'n to app. cross-mot. at 40).  However, the government's argument completely ignores the fact that ACI requested a no-cost termination for convenience immediately after the pre-construction conference where the government announced that Afghan workers would not be permitted on the base.  The government failed to respond to ACI's request, forcing ACI to continue performing on the contract.

The government additionally argues that, even if its failure to disclose information regarding base access were a breach, there would be a material factual dispute as to whether it was a material breach sufficient to excuse ACI's failure to perform (gov't opp'n to app. cross-mot. at 41-43, citing *Yates Desbuild Joint Venture v. Department of State*, CBCA No. 3350, *et al.*, 18-1 BCA ¶ 36,870).  As we decided above that there were material factual disputes regarding ACI's superior knowledge claim, we need not reach this issue.

CONCLUSION

For the reasons stated above, the cross-motions for summary judgment are denied.

Dated: April 29, 2021

DAVID D'ALESSANDRIS
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 61525, 62090, Appeals of Assist Consultants Inc., rendered in conformance with the Board's Charter.

Dated: April 29, 2021

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals